**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| SELECTSUN GMBH,           ) | |
|            ) | |
|     Plaintiff,      ) | |
|           ) | |
| v.              ) | CAUSE NO.: 1:14-CV-215-TLS |

SELECTSUN GMBH,                    )
                                  )
        Plaintiff,                )
                                  )
v.                                )        CAUSE NO.: 1:14-CV-215-TLS
                                  )
PORTER, INC. d/b/a THUNDERBIRD    )
PRODUCTS, and INTERNATIONAL       )
NAUTIC LLC,                       )
                                  )
        Defendants.               )

**OPINION AND ORDER**

Some boat sales lead to smooth sailing; others result in years-long litigation. This case falls into the latter category. On January 23, 2014, SelectSun filed a Complaint[1] [ECF No. 1] against Porter, Inc., in the United States District Court for the Southern District of New York. On February 19, 2014, SelectSun filed an Amended Complaint [ECF No. 3] that added International Nautic LLC as a defendant. On July 18, 2014, the case was transferred to the United States District Court for the Northern District of Indiana pursuant to 28 U.S.C. § 1404(a). (*See* ECF Nos. 47, 48.) No representative from International Nautic ever sat for a deposition, and while the entity initially filed an answer and motion to dismiss it appeared to abandon the litigation in late 2014. Accordingly, the Court struck International Nautic's answer and motion to dismiss, and indicated on March 31, 2016, that it would enter a default judgement against International Nautic as a sanction under Federal Rules of Civil Procedure 16(f)(1) and 37(b)(2)(A)(vi). (*See* ECF Nos. 130, 170.) On May 1, 2017, the litigation was reassigned to the Honorable Chief Judge Theresa

---

[1] The Second Amended Complaint [ECF No. 67] is the operative complaint in this litigation.

L. Springmann. The matter is now before the Court after a four-day bench trial. (*See* ECF Nos. 222–25.)

## FINDINGS OF FACT[2]

### A.    General Background

### 1.    *The Parties and Non-Parties*

Before the Court delves into the specific details produced at trial, it will address some preliminary matters to provide context for the factual background. There are four main entities involved in this dispute. SelectSun is the end-purchaser of a luxury boat ("the Boat"). As will be described later, Erich Schwaiger operates SelectSun. He purchased the Boat through different entities from a German boat dealer, Poker-Run-Boats, which is not a party to this litigation. One Alfred Zurhausen operated Poker-Run-Boats. He worked with an entity based in Jupiter, Florida, known as International Nautic, to have the Boat delivered to Germany. International Nautic was responsible for directly ordering and purchasing the Boat from Porter, a boat manufacturer. Porter builds boats under the Formula and Thunderbird brands and tradenames. SelectSun argues that, in reality, Poker-Run-Boats, International Nautic, and Porter, were all one in the same at all relevant times.

### 2.    *European Union Certification*

This controversy revolves around the fact that the Boat cannot be legally operated within the waters of the European Union as presently constructed. There are two pieces of documentation that were discussed frequently at trial. Both are produced by the International Marine Certification Institute ("IMCI"), an independent organization based in Belgium. If a boat

---

[2] The factual background is based on witness testimony at trial and exhibits admitted into evidence. (*See* Exhibit & Witness List, ECF No. 226.) The Findings of Fact are based upon a preponderance of the evidence.

manufacturer wants to market its products in the European market, then the manufacturer must work with IMCI to obtain proper certification for its products. One piece of documentation is the CE-certificate. IMCI provides a CE-certificate for standard models of boats that it has deemed to be in compliance with EU standards. Once a manufacturer receives a CE-certificate for a standard model, that model is considered CE-certifiable. But not every specific variant of that CE-certifiable model may be in compliance with EU standards—for example, certain custom features on a CE-certifiable model may not be in compliance with EU standards. Hence, a boat needs an individual Declaration of Conformity to show that it is in compliance with EU standards.

After a boat model is deemed CE-certifiable, IMCI provides the manufacturer of that model with Declarations of Conformity. The manufacturer then completes the document with specific information about each boat bound for the European market, such as its hull number (an identifier), and engine and exhaust types. Together, these documents show that (1) a particular boat model is certifiable for use in EU waters, and (2) a specific boat of that model is in compliance with EU standards.

**3.      *Structure of a Boat***

The experts and other trial witnesses described the structure of the Boat for the Court. The "shell" of a boat is known as the hull, and is reinforced with stringers that form a stringer system. The stringer system is then attached to four or five transfer bulkheads. This all forms the grid, which is responsible for absorbing and distributing forces placed on a boat as it displaces water. The cockpit sole and other portions of the deck are glued on top of the grid with a very strong industrial adhesive.

3

The hull and the grid are structural pieces of the boat. If either fails, the boat will take on water or sink. There are other parts of a boat that are non-structural components. These non-structural components include cabinetry, sound systems, tables, beds, and a thin film on the boat known as a gel coat. Gel coat is pigmented (not clear) polyester resin, usually at least two millimeters thick, and is placed over the paint of a boat by hand. Gel coat does not have the same structural integrity as the hull, in part due to its thinness, and can crack with frequent temperature fluctuations. Gel coat can break when there is structural damage below it, but can also crack on its own without structural damage to the hull or grid.

**B.    The Boat Purchase**

Erich Schwaiger[3] is a German businessman based in Munich. He is an attorney by training, but has spent the last twenty-five years as a real estate developer. Since 1998, he has developed over 2,500 apartments in Munich. While his business interests primarily lie in real estate, he also has side businesses. One of these side businesses is horse breeding, and is based in France. Another was a short-lived tanning salon based in Munich. Schwaiger uses an entity named Galileo SAS ("Galileo") to operate the horse breeding business, and utilized another entity called SelectSun GmbH ("SelectSun") to operate the tanning salon. Schwaiger has nearly 100 entities through which he operates his various business interests.

Schwaiger has long been interested in boats. His father was an active sailor, and therefore he was involved in various sailing activities growing up. He earned a license to navigate a boat in open seas, went on a 400-mile sailing excursion in the Caribbean with a crew, and sailed in regattas in Germany and elsewhere in Europe in his youth. Based on these experiences from his

---

[3] Schwaiger testified through an interpreter from South Carolina, Elisabeth G. Moser, at the bench trial. Moser also translated the testimony of SelectSun's expert, Hubertus Kettner.

childhood and adolescence, he has always had the desire to own a boat. In September 2012, he decided to purchase one, and went to a trade show known as Interboot in Friedrichshafen to find a worthy vessel.

At Interboot, he came across the Boat: a Formula 400 FX 8.[4] Schwaiger saw the Boat at a Formula booth that was manned by one Alfred Zurhausen. Schwaiger discussed his boat preferences with Zurhausen, and found that the Boat met all his major wishes: Schwaiger wanted a boat with sleeping quarters, a generator, and some deck space for seating. He also wanted a boat with a "sporty" look, meaning that the boat looked "aggressive," and provided the latest technology and state of the art appearance and performance. The Boat was also a proper length at forty feet long. Schwaiger left with two brochures that he received from Zurhausen. (English Language Brochure, Pl. Ex. 2; German Language Brochure, Pl. Ex. 5.) The English Language Brochure includes the following address (the "Decatur address"):

Thunderbird Products
2200 W. Monroe Street
P.O. Box 1003
Decatur, IN 46733-5003

(Pl. Ex. 2 SelectSun 0000027.) The English Language Brochure also contains a Formula tradename in all capital letters above the address, and a Thunderbird logo next to the address. (*Id.*) The English Language Brochure also lists two phone numbers: (260) 724-9111 and 1-800-736-7685. (*Id.*)

---

[4] As indicated previously, the Court will refer to the boat at issue as "the Boat" throughout this Opinion and Order. The Formula 400 Super Sport, referred to in testimony and documents as the 400 SS, was the original model of the Boat, and was developed in 1998 and introduced into the marketplace in 1999. It is forty feet long. Internationally, the 400 SS is known as the 420 SS because the actual length of the boat with its extended platform is forty-two feet. The FX 8 model is an enhanced version of the 400 SS. Several documents use these brand names (400, 420, 420 FX 8) interchangeably. Where relevant, the Court will note and explain the difference.

The German Language Brochure contains the same Thunderbird logo, Formula tradename, and Decatur address as the English Language Brochure. (Pl. Ex. 5 SelectSun 0000819.) It also contains a second address (the "Jupiter address"):

FORMULA – Thunderbird Products
141 Fisherman's Way
Jupiter, Florida 33477

(*Id.*) The German Language Brochure has a copyright notice provided by "Formula Thunderbird Products, USA," but does not list any phone numbers. Both brochures indicate that Formula boats could be CE-certified, which is required for legal use in the Europe Union. At that time, Schwaiger leased a boat dock in Slovenia, which at all relevant times was a member of the European Union, and desired to use the Boat in European waters.

Schwaiger is a sophisticated businessman, and he tries to get the best possible price on any purchase. He therefore sought to buy the Boat directly from the manufacturer, and called the phone number on the back of the English Language Brochure in an attempt to do so. Schwaiger testified that when he called a number on the English Language Brochure, he was directed to the sales or marketing department and spoke to a woman there. When he informed her of his intent to purchase the Boat directly from the manufacturer to receive the best possible price for delivery to Germany, she informed him that a German representative, Zurhausen, was authorized to provide the best possible price on the Boat. From this conversation, Schwaiger testified that he thought that by contacting Zurhausen he would be purchasing the boat directly from the manufacturer. So he called up Zurhausen, and asked him to visit Munich so that they could discuss the purchase of the Boat.

On September 29, 2012, Zurhausen visited Schwaiger in Germany. There, he presented Schwaiger with an offer for a Formula 420 FX 8 with several options and pricing. (*See* Pl. Exs.

7, 8.) The offer was valid until October 4, 2012, had a Thunderbird logo and the Formula

tradename, and also listed Poker-Run-Boats at the top of the document.[5] Poker-Run-Boats was a

boat dealer based in Germany, owned and operated by Zurhausen. The offer set out terms for,

among other things, a custom switchable exhaust system and the installment payments for the

Boat. Schwaiger and Zurhausen then finalized the terms of the sale on October 1, 2012, by

signing a contract for the purchase of the Boat ("October 1 Contract"). (Galileo Poker-Run-Boats

Contract (German), Pl. Ex. 9; Galileo Poker-Run-Boats Contract (English), Pl. Ex. 10.) The

contract lists Galileo, represented by Schwaiger, as the purchaser, and Poker-Run-Boats,

represented by Zurhausen, as the seller. Some relevant contract terms are provided below:

- German substantive and formal law governs the execution and interpretation of the contract, with a venue for disputes in Munich;

- At any time, Schwaiger may substitute another entity for Galileo as the purchaser;

- The Boat will be paid for in three installments ($250,000; $340,000; and $250,000), and the final installment will be paid to the seller of the boat;

- Poker-Run-Boats declares that the manufacturer grants a 12-month extension on the warranty on the motors and drives, a 24-month manufacturer's warranty on all other components, and a 120-month manufacturer's warranty on the boat's hull;

- The boat will include a CE-certificate;

- The Boat will be delivered to Portoroz, Slovenia, no later than April 2013; and

- "In cooperation with the manufacturer and the importer, this boat will be used outside of the main season for two dry industry trade shows, namely to [sic] boat tradeshows in Düsseldorf, and one wet industry trade show, namely in Miami."

(Pl. Ex. 10.) A boat lift—manufactured by some other entity than Porter—valued at $68,816.85

was also apparently included in the deal on October 1, 2012. (*See* Pl. Ex. 12.) Approximately

---

[5] Plaintiff's Exhibit 7 is the German language offer, with includes pictures, logos, and illegible handwritten notes. Plaintiff's Exhibit 8 is an English translation of Plaintiff's Exhibit 7.

two and a half months later on December 19, 2012, Schwaiger substituted SelectSun as the purchasing entity for Galileo. (*See* SelectSun Poker-Run-Boats Contract (German), Pl. Ex. 18; SelectSun Poker-Run-Boats Contract (English), Pl. Ex. 19.) The contract otherwise remained the same.

After Zurhausen and Schwaiger signed the October 1 Contract, Schwaiger prepared to make payments in installments as required by the contract. Schwaiger, however, wanted confirmation that any funds that he transferred were going to the correct source. Zurhausen provided him with four documents, marked in evidence as Plaintiff's Exhibits 14, 15, 16, and 17. None are dated. Plaintiff's Exhibit 14 is a document from Wayne Porter, Vice President of Sales, which acknowledges an entity called International Nautic as its Director of International Sales and an official representative of Formula Boats. The document also contains the Thunderbird logo, the Formula tradename in all capital letters, and the same Decatur address and phone number as the English Language Brochure. Plaintiff's Exhibit 15 appears to be an email from Leila Burger,[6] although it lacks a date and recipient email address. The email includes wire transfer instructions for International Nautic, and indicates that International Nautic is the Director of International Sales for Formula Boats. The email signature appears to include a "Formula International Sales" tradename. Also included is Leila Burger's business card. The business card contains the Thunderbird logo, Thunderbird tradename, Formula tradename in all capital letters, the Formula Boats website, the Decatur address, and the Jupiter address. The business card lists Leila Burger's email address as leila@nauticllc.com. The email appears notarized as of October 12, 2012.

---

[6] Leila Burger and Peter Burger are a married couple who operated International Nautic. Several witnesses and documents refer to Leila Burger under her maiden name, Kitzinger. The Court will, for consistency, refer to her as "Leila Burger" throughout this Opinion and Order.

Plaintiff's Exhibit 16 lists the procedure for international wire transfers for the sale. The document contains the Thunderbird logo and Formula tradename in all capital letters. It also instructs the paying party to deposit funds in a Deutsche Bank account in New York for further credit to International Nautic at the Jupiter address. Plaintiff's Exhibit 17 contains the same relevant information. All four documents were provided to Schwaiger by Zurhausen.

On March 19, 2013, about six months after Schwaiger and Zurhausen signed the October 1 Contract, Leila Burger notified Zurhausen that the Boat had been paid in full. (*See* Pl. Ex. 26.) The confirmation includes the International Nautic tradename, a "Formula International" tradename, and the Jupiter address. The confirmation also lists Poker-Run-Boats as the dealer for the boat. Schwaiger testified that he later received the confirmation from Zurhausen via email, but did not specify precisely when he received it, or why.

### C.    Porter Employees

While Schwaiger made installment payments, other parties went about their jobs to ensure the Boat would be built and delivered on time. These other parties form a web of entities, employees, and alleged agents that provide the main basis for this dispute. Porter, one of the defendants in this litigation, built the Boat. Porter does business under multiple tradenames, including Formula Boats and Thunderbird. SelectSun alleged that Porter, Poker-Run-Boats, and International Nautic are parts of the same whole. Although there is no formal entity known as "Formula International" or the "Formula Group," Porter employees often say that they work for Formula or Thunderbird since these tradenames are recognizable in the marketplace, whereas Porter is not. The following Porter employees testified over the course of the bench trial, and

provided details regarding what occurred after Zurhausen and Schwaiger signed a contract for the Boat:

- Wayne Porter,[7] Vice President of Sales and co-owner of Porter;

- Lori Snyder, an Internal Sales Coordinator;

- Jason Brune, a Project Engineer;

- Scott Smith, a Marketing Manager; and

- Mike Boyd, Director of Product Support and Consumer Affairs.

## 1.    *The Sales Team Structure at Porter*

At the bench trial, Wayne Porter described the Porter sales team structure as it existed in 2012. He was the VP of Sales, and sat atop the sales team structure. Under him were three regional sales managers who handled the domestic market in three different geographical areas (Northeast, Southeast, and Midwest). The regional sales managers were Porter employees.

At that time, Porter's international sales were handled by Peter Burger and Leila Burger through their own entity, International Nautic. Wayne Porter provided Leila Burger with the business card that Zurhausen later passed along to Schwaiger. (*See* Pl. Ex. 15.) Zurhausen, through Poker-Run-Boats, was also at that time the official German dealer for Porter. The business card lists Leila Burger as an International Sales Coordinator, seemingly for Formula/Thunderbird Products, but Wayne Porter denied that Leila Burger held an official role with Porter. Wayne Porter testified that at that time International Nautic, and specifically Peter Burger, served as an authorized Director of International Sales for Porter. He provided Peter Burger with a document, Plaintiff's Exhibit 14, which acknowledged International Nautic as the

---

[7] The Court will refer to Wayne Porter by his full name to avoid confusion with Porter, Inc.

Director of International Sales for Formula Boats. He did so because Peter Burger asked him to provide it so that Peter Burger could secure space for booths at a boat show in March 2012. Wayne Porter testified that he did not know that Peter Burger retained the document, and never intended for him to do so and use the document to entice prospective buyers. As mentioned previously, Plaintiff's Exhibit 14 is not dated.

Wayne Porter further testified that he was aware of both the English Language Brochure and the German Language Brochure, but that only the English Language Brochure was officially developed by Porter. The German Language Brochure was developed by International Nautic for sales in Germany.

Every year, Wayne Porter attends the Düsseldorf International Boat Show, which is held during the last week of January. Porter does not have any inventory overseas, and as a result Peter Burger would coordinate space and inventory for international boat shows and report his plans to Wayne Porter. Wayne Porter had the power to approve those plans, and would make suggestions and decisions about which Formula boats were to be displayed at various boat shows. Zurhausen would then set up the booth at these boat shows.

Wayne Porter testified that he attended the Düsseldorf International Boat Show in January 2013, and while there he interacted with Schwaiger, who was at a Formula booth. The parties dispute whether Wayne Porter thanked Schwaiger "for his business" or "for his interest" regarding Formula Boats. Wayne Porter did testify that he knew that, in January 2013, Porter was preparing an order for the Boat to sell to International Nautic, and he understood that if the sale was finalized then Schwaiger was the likely end-recipient of that order. After meeting Schwaiger, Wayne Porter learned that Schwaiger wanted to send a representative to Decatur to

examine the Boat before the deck was glued on and prepare a report. He notified Lori Snyder via email of the same on January 19, 2013. (*See* Pl. Ex. 70.)

**2.      *The Order Process***

At the bench trial, Porter employees explained the order process at the company. All orders are submitted to the team based in Decatur, including, at relevant times, orders from International Nautic. The first thing that comes through is called a quickie order form. A quickie order form is a one-page document based on a specific boat model with various options for that model, such as colors and available engines. Sometimes more than one quickie order form is generated per order. Once a Porter employee receives a quickie order form, she inputs the chosen options and model into the Porter computer system. The system will notify the employee if such a combination is not feasible. Special requests are sometimes included separately from the quickie order form's limited options. These special requests are redirected to other departments, such as engineering, to determine whether the special request is feasible. Porter has its own set of quickie order forms for domestic models, which use its domestic model numbers such as 400 SS and 400 FX 8. International Nautic developed their own quickie order forms for the international model numbers, such as 420 SS and 420 FX 8.

Lori Snyder was generally the first person at Porter to receive a quickie order form when it was sent to Decatur. She was familiar with Leila Burger and International Nautic, because Snyder would receive quickie order forms from Leila Burger and then help process the order through the next required steps. Snyder knew that Leila Burger ultimately delivered boats to boat dealers outside the United States. Snyder received a quickie order form from Leila Burger for the

Boat.[8] (*See* Pl. Ex. 33.) The quickie order form listed Poker-Run-Boats as the dealer. Later, Snyder received an updated quickie order form that included several special requests, including a custom exhaust system. (*See* Pl. Ex. 35.) The custom exhaust system would have a switch that would allow a user to divert exhaust either above or below the water line. EU noise restrictions require exhaust systems that expel below the water line. Snyder handwrote updates regarding feasibility and any thoughts for follow-ups that she may have on the updated quickie order form, and kept these records for later reference.

Snyder and Leila Burger emailed back and forth concerning the special requests over the next couple of weeks. On November 8, 2012, Snyder notified Leila Burger that sunbeds could not be installed on the foredeck due to the layout of certain deck hatches, and that a copier would not fit through a cabin door on the Boat. (Pl. Ex. 37.) On November 14, 2012, the two discussed whether the exhaust system would be CE-certifiable. (Pl. Ex. 40.) Snyder indicated that Porter would attempt to work with a manufacturer, Ilmor, to appropriately accommodate the CE-certification issues that may arise with the custom exhaust system; Leila Burger appeared to assume that the exhaust would be compliant with a speed switch. On November 21, 2012, Leila Burger notified Snyder that her client really needed the custom exhaust system, and that the client may use the boat in waters where CE-certification is not required. (Def. Ex. L.) She also suggested that perhaps the client would come up with a custom fix at a later date after delivery. (*Id.*)

Snyder later printed a sales order confirmation for the Boat on November 27, 2012. (*See* Pl. Ex. 45.) This sales order confirmation included the CE-certification that was required for the Boat to be lawfully used in the waters of the European Union. On November 29, 2012, Snyder

---

[8] The order was likely placed on November 10, 2012, based on Plaintiff's Exhibit 45, a sales order confirmation.

sent Leila Burger a copy of an order form for the Boat, presumably Plaintiff's Exhibit 45, and noted that (1) there had been several special requests that needed to be confirmed for accuracy and that (2) Porter was still waiting on the exhaust information. (Pl. Ex. 50.) The same day, Leila Burger responded that she had discussed the custom exhaust system with Ilmor, and that she understood that the system would satisfy the noise emission requirements for CE-certification. (*Id.*) Snyder later noted in her file that Porter engineers came to the opposite conclusion after talking to Ilmor: That the custom exhaust system would not be CE-certifiable. (*Id.*) A sales order confirmation printed November 29, 2012, contains CE-certification and notation that the standard exhaust system (Std. FX Side Exhaust) should be removed. (Pl. Ex. 52.)

On December 5, 2012, Leila Burger provided answers to some of Snyder's outstanding questions regarding the Boat. (*See* Pl. Ex. 58.) Snyder had asked Leila Burger to make a final decision on the exhaust system, and she responded that "we will use the exhaust like in the drawing, but without the center thru [sic] hull pipes, so that the muffler boxes fit[.]" (*Id.*) Presumably, these muffler boxes were meant to lessen the noise produced by the custom exhaust system to bring it in compliance with EU standards. Snyder noted in her file that the last photo provided of the custom exhaust system was not CE-certifiable. (*Id.*) On January 8, 2013, Snyder printed the sales order confirmation for the Boat. (Pl. Ex. 65.) This sales order confirmation contained the custom exhaust system—approved by engineering—and did not have CE-certification. One of the engineers who approved the final configuration of the boat was Jason Brune. Snyder testified that throughout the process she did not communicate with anyone from SelectSun, and rather dealt directly with Leila Burger throughout the process.

3.      *Implementing Special Requests*

At all relevant times, Jason Brune was a Project Engineer at Porter and a point of contact for special requests. He received orders from Snyder, and dealt with various internal departments to determine the feasibility of special requests and ultimately move the Boat along through production. He generally did not deal with end-customers like Leila Burger; instead, he helped employees like Snyder solve problems for end-customers like Leila Burger. Brune testified that he informed Snyder that the Boat could either be CE-certified or have its custom exhaust system, but not both. When he received word that Leila Burger approved the custom exhaust system, he approved the production of the non-CE-certified boat.

a.      *The Test Run*

Brune interacted occasionally with Zurhausen. In early 2013, after the Boat went into production with its custom exhaust system, Schwaiger paid for Zurhausen to visit Decatur, tour the facility, and take the Boat out for a test drive. Brune showed Zurhausen around the Porter facility, but did not accompany him on the test ride. Scott Smith, a marketing manager with Porter, did accompany Zurhausen on the test run, along with two employees in the Propulsion Department at Porter. The group took the Boat out on a calm lake, calibrated the compass, and ran the boat at top speed (seventy miles per hour). The idea behind the trip was to give Zurhausen, at Schwaiger's request, a look at everything involving the boat before the deck went on it. Smith testified that foreign boat dealers very rarely visit Decatur for test runs like that, and usually perform such a test run at their own facilities. In this case, Schwaiger paid for Zurhausen's trip, so Porter was willing to host him.

15

b.     *European Certification Documents*

While Brune generally did not deal with Leila Burger, he occasionally interacted with an International Nautic employee named Angela Solima. In April 2013, shortly after the boat was built, Solima asked Brune over email for a CE-certificate for the Boat, as well as a Declaration of Conformity. (Pl. Ex. 80.) On April 24, 2013, Brune advised Solima that, per previous discussions, the Boat's custom exhaust system could not be CE-certified. (*Id.*) Solima thanked him for the update. Months later, on November 28, 2013, Solima reached out again to Brune and asked for a CE-certificate for the Boat. (Pl. Ex. 82.) Leila Burger also reached out that day and asked for an updated IMCI document for the Boat to show that IMCI approved the increased power of the Boat's engine. (Pl. Ex. 83.) Brune responded the same day and explained, as he had previously, that the Boat was built with the understanding that it would not be CE-certified because of the custom exhaust system. (Pl. Ex. 82.)

Brune reached out to IMCI on November 20, 2013, to renew approval of the Formula 400 SS, the standard model of the Boat. (Pl. Ex. 86.) The updated approval included the alternate names of the model,[9] and sought to change the loaded displacement mass and maximum rated engine power of the Formula 400 SS. On November 21, 2013, the IMCI alerted Brune that it had learned about a German litigation involving a 420 SS with Ilmor engines; Brune responded that Porter had no knowledge of such litigation, but that it had manufactured only one 420 SS with Ilmor engines and that it was bound for a non-CE country in Europe. (*Id.*) That boat was the Boat. Brune passed along this development to Wayne Porter. (Pl. Ex. 116.) Wayne Porter discussed the Boat and the litigation with Peter Burger, who explained that driver negligence—

---

[9] These are the tradenames and variants described previously: Formula 400 Super Sport, Formula 420 Super Sport, Formula 400 FX 8, and Formula 420 FX 8.

specifically using the Boat with considerable power applied against waves higher than twelve feet—was the likely source of the damage rather than the size of the engines. (*Id.*)

Ultimately, the IMCI decided to approve the updates to the standard Formula 400 SS model, and Brune informed Leila Burger, Peter Burger, and Zurhausen of this on November 27, 2013. (*See* Pl. Exs. 90, 91.) On December 3, 2013, Brune received copies of the updated Declaration of Conformity and CE-certificate for the standard Formula 400 SS, and forwarded sample copies of the same to Leila Burger and Zurhausen. (*Id.*) The sample copy of the Declaration of Conformity is not signed by Brune, does not contain a hull number, and lists an integral exhaust system as the only approved exhaust system. (Pl. Ex. 91.) Brune testified that the sample Declaration of Conformity and CE-certificate were provided so that the Burgers and Zurhausen could secure space at boat shows, such as the upcoming Düsseldorf International Boat Show, and demonstrate to potential customers that the standard Formula 400 SS and its variants were CE-certified. The Boat has a custom exhaust system which is not an integral exhaust system, and hence was not CE-certifiable with its custom exhaust system.

### D.    Summer 2013

On May 7, 2013, Zurhausen delivered the Boat to a port in Wiesbaden, Germany.[10] (Pl. Exs. 29, 30.) Schwaiger testified that about two weeks later the Boat was sent to Portoroz, Slovenia, where he used it for the first time. He took a three day trip to Venice to try out the Boat with his son and Zurhausen. Problems arose. Schwaiger testified that the gel coating on the boat cracked in certain areas, and that brackets from the sunroof broke. He further testified that he did not flip the boat or experience any similar event on the trip. Afterwards, on Hubertus Kettner's

---

[10] The boat was delivered to one Marcus Boehle of an entity named Leaseforce AG. Schwaiger testified that he used Leaseforce AG to finance his purchase of the Boat.

advice, Schwaiger drove the Boat from Portoroz to a marina in Tribunj, Croatia, where the weather is nicer and the sea is calmer. He made the trip in a day, and did not encounter any issues on that trip.

In August 2013, Schwaiger used the Boat again for about thirty hours. He experienced more issues with the Boat during that time. For example, the steering column of the boat blew out, and even after it was fixed the engines appeared to fail. He had to have the boat hauled, and it turned out the drive shaft was broken. The drive shaft was replaced under warranty by its manufacturer, Ilmor. Zurhausen handled that warranty inquiry. Later, the interior furnishings were damaged and the gel coating cracked while Schwaiger was using the boat. He emailed photos of the damage to Zurhausen on August 17 and August 20, 2013. (Pl. Ex. 114.) Schwaiger testified that no repairs were made after this, and that he sought an expert from the German Automobile Club—which also provides experts on boats.

The Club listed Hubertus Kettner as an expert, and since Schwaiger knew Kettner, he sought out his opinion on the damage to the Boat. Based on Kettner's opinion, which the Court will address later, Schwaiger asked Zurhausen to take back the Boat. Zurhausen said that he could help Schwaiger sell the Boat, but that Schwaiger would have to pay for professional photography for any sale listings. On August 26, 2013, Schwaiger told Zurhausen to list the Boat for sale on certain boat trading websites. (Pl. Ex. 135.) Zurhausen complied, but the Boat did not sell. In early November 2013, Schwaiger told Zurhausen to pick up the boat because it was not selling, and Zurhausen complied. On November 10, 2013, Leaseforce AG and SelectSun prepared an assignment agreement, which assigned to SelectSun any and all claims against Porter and International Nautic related to the delivery of the Boat. (Pls. Exs. 31, 32.) The

assignment agreement provided that the agreement had no effect on any claims against Poker-Run-Boats. (*Id.*)

Scott Smith, a Porter marketing manager, serviced about six to eight warranty requests for Zurhausen during the summer of 2013. These included the replacement of underwater lights and of a bow thruster. Towards the end of the summer, on August 17, 2013, Zurhausen forwarded pictures of various damage to the Boat to Smith. (Pl. Ex. 110.) Smith later forwarded the pictures to Mike Boyd, the Director of Product Support and Consumer Affairs at Porter. (*See id.*) The five pictures are included in the set of pictures contained in Plaintiff's Exhibit 114, and appear to show a broken door frame bracket, a broken refrigerator bracket, a bent cabinet, and cracked gel coating.

Boyd also testified at the bench trial. He stated that Porter's standard limited warranty (Defendant's Exhibit A) was listed on Porter's website at all relevant times in 2012. The limited warranty was also included in an owner's binder, along with several other binders full of information regarding various components and equipment included in a boat, which is provided as a standard practice in all boats manufactured by Porter.[11] He also included a copy of the limited warranty when he responded to SelectSun's settlement demand on January 13, 2014. (*See* Pl. Ex. 118.) In that response, Boyd indicated that Porter was "hopeful that an amicable resolution can be reached without involving the courts." (*Id.* at Porter 624.) Ten days later, SelectSun filed this lawsuit.

---

[11] The owner's manual is provided in English. Occasionally, international dealers will provide translations for the owner's manual.

### E.    The Experts

Both parties presented expert testimony at the bench trial. Hubertus Kettner testified on the Plaintiff's behalf via video transmission.[12] He prepared a report[13] based on his inspection of the Boat and the photographs taken by Schwaiger in Plaintiff's Exhibit 114. Kettner is trained as master automobile mechanic, but has long had an interest in boats. Through his personal experience working on recreational boats, he became a recognized expert in water crafts and buoyancy by the German Automobile Club. When Schwaiger was looking for an expert to examine the damage to the Boat, the German Automobile Club's boat department recommended Kettner.

Kettner determined that the damage in the photos was caused by the power in the Ilmor engines, which were about 300 kilowatts more powerful than the CE-certification process allowed for a standard Formula 400 SS in March 2013.[14] He testified, in essence, that the engines were so heavy and powerful that ordinary use of the boat would result in broken interior items, like brackets and cabinets, and cracked gel coating. He further testified that the Boat would have to be completely deconstructed to determine whether there was true structural damage. On cross examination, Kettner testified that he went full throttle on the Boat with Schwaiger during a trip without any problems, and that the Boat could be operated in smooth seas at fifty-five knots without causing any damage to the boat. At sixty knots, however, the vibrations from the engine and force from the water would damage the Boat.

---

[12] Kettner planned to testify in person at trial, but refused to travel after discovering a note that alluded to his upcoming trip to Fort Wayne that he found threatening in the days before trial. (*See* ECF Nos. 218, 219, 220.)

[13] Kettner's report can be found in its original German in Plaintiff's Exhibit 121, and in an English translation in Plaintiff's Exhibit 122.

[14] The IMCI approved the increased engine power for the standard Formula 400 SS in December 2013.

Porter's expert, Augusto Villalon, disagreed. Villalon has been involved in the business of boating for more than fifty-five years. He is an engineer by training, but also holds a business degree. He has performed consulting work on behalf of the United States Coast Guard, where he helped develop minimum safety standards for boats used in the United States and also implemented a reporting system that provides the Coast Guard with daily reports of boating accidents across the country. Additionally, he personally investigated certain accidents as part of his contract with the Coast Guard. Villalon also founded a successful design and development company, Marine Concepts.

Villalon examined Kettner's report and reviewed the depositions and other litigation materials in this case to prepare his own expert report, and provided background on the general structure of a vessel like the Boat. He then testified that, as Kettner conceded, the Boat could be run at high speeds in calm waters without issue. However, he disagreed that vibrations of this Ilmor engine could be strong enough to cause damage to the Boat's interior fixtures. He testified that, among other things, an engine with internal vibrations strong enough to theoretically damage other parts of a boat would blow apart before it damaged the boat solely due to vibrations. In such a scenario, the engine would not be structurally sound enough for its internal moving components to achieve anywhere near the engine's maximum output.

The Boat also had highly efficient propellers, minimizing the chance for captivation and damage from the same. Villalon also testified that, while the power of the engine is important when calculating the stress placed on the boat (higher speeds will result in more stress), the weight of the engine matters more. For example, if two engines have the same weight and sea conditions cap the top speed of each boat at fifty knots, then the amount of kinetic energy in each boat when it reaches fifty knots is exactly the same, regardless of each engine's maximum horse

power. The boat's structure then needs to disperse the same amount of kinetic energy when it displaces water. Therefore, according to Villalon, the manner of the Boat's use matters more than the maximum power of its engines.

Villalon stated that, instead of Kettner's explanations, the far more likely cause of the damage was that the Boat was driven hard and fast in rough waters, and the resulting force was strong enough to break interior brackets, crack gel coating, and damage other interior components. But nothing structural in the Boat ever failed, and in fact was strong enough to maintain the various forces it received at high speeds on rough water.

## F.    Aftermath

The record is not entirely clear on the Boat's location at the time of the bench trial. Schwaiger testified that he believes Zurhausen is holding the Boat somewhere near Frankfurt. He did not explain the basis for this thought. Wayne Porter saw the Boat at the Düsseldorf International Boat Show at International Nautic's display booth in January 2014. He also testified that the Boat looked presentable, although he did not have an opportunity to view the cabin area or living quarters. Wayne Porter further testified that in January 2015, Brune inspected the Boat in a warehouse somewhere within a ninety minute drive of the Düsseldorf International Boat Show at Zurhausen's request.[15] Brune was not asked about this inspection when he testified at trial.

Also in January 2015, International Nautic shut down its business, and finished its orders through a new entity called INC Trading. Wayne Porter testified that Leila Burger and Peter Burger are believed to be residing in Southern Switzerland, but that their exact whereabouts are

---

[15] The Court asked for clarification on the precise year in which Brune examined the Boat, and Plaintiff's counsel asserted that Brune examined the Boat in January 2015, rather than January 2013 or January 2014.

unknown. Somewhat similarly, Poker-Run-Boats has ceased operations, and Zurhausen now apparently operates through a new entity known as Marine Partners Network. For a brief period of time, Porter replaced Poker-Run-Boats with Marine Partners Network on its listing of international dealers on its website.

**G.    Claims and Damages**

SelectSun had seven remaining causes of action at the time of trial: breach of express contract; breach of implied in fact contract; breach of the duty of good faith and fair dealing; breach of express warranty; breach of implied warranty; violations of the Magnuson-Moss Act, 15 U.S.C. §§ 2301 *et seq.*; and unjust enrichment. Liability is premised on apparent agency: SelectSun asserts that Porter is liable based on the contract signed by Schwaiger and Zurhausen.

SelectSun asserts that it is entitled to recover the following damages, under any of the above theories: the purchase price of the Boat ($840,000), financing costs related to the purchase of the Boat ($124,000), and the cost of a boat lift ($68,816.85). Damages therefore total $1,032,816.85. SelectSun also indicated its intent to seek attorneys' fees under Section 2310 of the Magnuson-Moss Act.

**CONCLUSIONS OF LAW**

There are two defendants in this case: Porter and International Nautic. The Court has already determined that a default judgment will be entered against International Nautic. The Court will first address its findings regarding any potential liability for Porter, and then turn its attention to International Nautic.

**A.    Porter Liability**

Counsel for SelectSun stated in closing "that the quotation of September 29, 2012, was handed to Mr. Schwaiger by Mr. Zurhausen, with apparent authority to represent Formula Boats, and that he has acted, Mr. Zurhuasen, as the apparent agent of Porter, Inc., ever since." (Tr. 654: 15–19.) This argument does not hold water.

**1.    *Apparent Authority***

To begin, apparent authority "is the authority that a third person reasonably believes an agent to possess because of some manifestation from his principal." *Sword v. NKC Hosp., Inc.*, 714 N.E.2d 142, 148 (Ind. 1999). The principal must make the manifestation to a third party, either directly or indirectly, and the manifestation must reasonably cause the third party to believe that an individual is an agent of the principal and act upon that belief. *Id.* As stated by the Honorable James T. Moody in an earlier Opinion and Order withholding summary judgment on the issue of apparent authority, "[b]ecause the manifestations conveying the existence of authority must be made by the principal, the [C]ourt focuses only on those facts . . . involving direct or indirect communications from Porter to Schwaiger." (Opinion & Order 17, ECF No. 179.)

a.    *Zurhausen and Poker-Run-Boats*

The Court must examine any manifestations Porter made towards Schwaiger on or before September 29, 2012, to determine if Zurhausen acted with apparent agency. The Court finds these manifestations limited and lacking. The manifestations here are the brochures describing Formula products that Schwaiger obtained from Zurhausen at Interboot, the fact that Zurhausen

24

was working a booth at Interboot for Formula products, and a phone call Schwaiger made to a number on one of those brochures that directed him to Zurhausen and Poker-Run-Boats as an official German dealer for Formula products. These manifestations would not cause a reasonable person, much less a sophisticated businessperson, to believe that Zurhausen was an agent of Porter. The language in the offer and in the signed contract support this conclusion.

First, the offer[16] does indeed contain the Formula logo and tradename. But the German language version also includes the dealer's name, Poker-Run-Boats.[17] (*See* Pl. Ex. 7.) The offer lists several different prices, including the list price from the American manufacturer and the price paid by the regional dealer. (*Id.* at 2.) The offer also contains an importer discount (20.5%) on the list price and a manufacturer promotional discount (13%). (*Id.* at 3.) Further, the down payment can be made to either (1) "Formula International USA" or, alternatively, via surety bond to Poker-Run-Boats. (*Id.*) The offer additionally provides that the manufacturer and importer have a right to use the boat in three boat shows. (*Id.*) The document clearly uses different language to refer to different entities, i.e. "manufacturer" and "importer."

Second, the language in the October 1 Contract[18] further supports an absence of apparent authority.[19] To begin, the "Seller" is referred to as Poker-Run-Boats, and the "Buyer" is an entity controlled by Schwaiger. The Seller, Poker-Run-Boats, granted the Buyer a 20.5% discount in the contract, which is the same 20.5% listed in the offer as an *importer* discount, rather than a

---

[16] The English version of the offer is Plaintiff's Exhibit 8.

[17] This is found in the top left hand portion of the offer, right above Erich Schwaiger's name. The Poker-Run-Boats name is not included in the English translation, while all other text is.

[18] This contract, whose English translation is provided in Plaintiff's Exhibit 10, is the contract upon which SelectSun maintains this action. A later version of the contract, Plaintiff's Exhibits 18 and 19, substituted the purchasing entity but kept all other terms.

[19] The contract contains a provision that "German substantive and formal law exclusively applies to the execution and interpretation of this agreement[.]" (Pl. Ex. 10 at 2.) The Court is not engaging in contract interpretation, per se, but is instead examining the language in the agreement to determine the impact that previous manifestations made by Porter had on Schwaiger.

*manufacturer* discount. There is only space for Schwaiger and Zurhausen to sign the contract. There is nowhere for another representative to sign the contract. The contract also specifies the venue for any litigation over the contract (Munich) and a choice of law provision (German law). Presumably, those two provisions explain why any litigation involving Poker-Run-Boats and SelectSun occurred in Germany. Based upon the testimony at trial, SelectSun did not name Porter as a defendant in the German litigation.

But there is one provision in particular which strongly weighs in Porter's favor. The second page of the contract provides that "[b]y virtue of selling and delivering the boat, Seller [Poker-Run-Boats] transfers to Buyer [Schwaiger entity] all product warranty and other claims against the manufacturer. Buyer hereby accepts this transfer." (Pl. Ex. 10 at 2.) This provision is only valuable if the Seller and manufacturer are different entities: If these entities are one in the same, then the provision is glaringly duplicative. The contract is otherwise very reasoned and deliberate—it includes (among other details) attachments listing dozens of add-on features, choice of law provisions, and entity substitution rights. The Court finds that a reasonable person would only include a provision like this if he thought the manufacturer and Seller were different entities. Further, SelectSun did not present the argument that it is enforcing rights held by Poker-Run-Boats against Porter. Given this, the contract between Zurhausen and SelectSun cannot form the basis for any liability for Porter.[20]

---

[20] SelectSun has not clearly put forth a ratification argument. Under certain circumstances, a principal may ratify an unauthorized contract entered into by another party. *Maxitrol Co. v. Lupke Rice Ins. Agency*, 924 N.E.2d 179, 183 (Ind. Ct. App. 2010) ("Ratification is the adoption of that which was done for and in the name of another without authority.") "Whenever a principal is sought to be held liable on the ground of ratification, either express or implied, it must be shown that the principal ratified upon full knowledge of all material facts, or that he was willfully ignorant, or purposely refrained from seeking information." *Id.* at 184 (citing *Crumpacker v. Jeffrey*, 115 N.E. 62, 67 (Ind. Ct. App. 1917)). SelectSun asserts that, at the Düsseldorf International Boat Show in January 2013, while the Boat was in production, Wayne Porter thanked Schwaiger for his business. Wayne Porter testified that he only thanked Schwaiger for his "interest" in Formula products. While the Court does not find this particular assertion by Wayne Porter entirely credible, this is the only fact presented by SelectSun that could support a ratification theory. Standing alone, even viewed in SelectSun's favor, that fact it is inadequate to establish ratification.

b.     *International Nautic*

The apparent agency analysis is somewhat confusing for International Nautic. For example, the contracts between Zurhausen and Schwaiger never mention International Nautic, and the testimony at trial indicate that Schwaiger only discovered Leila Burger and International Nautic through representations and manifestations from Zurhausen, rather than directly from Porter. Schwaiger testified that even the full payment confirmation, Plaintiff's Exhibit 26, was provided by Zurhausen. But all of this documentation (Plaintiff's Exhibits 15, 16, 17, and 26) relates solely to the installment payments required by the October 1 Contract. None of this documentation shows, for example, that Schwaiger had any idea that Leila Burger would be responsible for building the Boat to his specifications. The documentation certainly established that Leila Burger and International Nautic had the apparent authority to accept payments on behalf of Porter. SelectSun argues that it extends further than this.

Plaintiff's Exhibit 14 does weigh in SelectSun's favor. The document is undated, but lists International Nautic as an official representative of Formula Boats, and is signed by Wayne Porter and accompanied by an official Porter seal. Standing alone, the document may, under certain circumstances, establish apparent or actual authority liability. But in context, with a contract between two sophisticated business parties and directions that relate exclusively to wire transfer and payment instructions, the Court finds it insufficient to establish apparent authority. A reasonable person, under these circumstances, would likely conclude that International Nautic was responsible for collecting payments related to the sale of the Boat, but not more.

The behavior of the parties also supports this conclusion. Schwaiger never mentioned Peter Burger in his trial testimony. He only mentioned Leila Burger in relation to Plaintiff's Exhibits 15, 17, and 26. He did not receive Leila Burger's business card at a boat show, or from

27

her personally, but instead from Zurhausen as part of an email that confirmed the method of payment as detailed in the October 1 Contract for the purchase of the Boat. The record is entirely unclear as to whether Schwaiger had any inkling that International Nautic played any role other than financial intermediary until this litigation began. Accordingly, the Court finds that SelectSun has not met its burden of proof to establish that International Nautic acted with apparent authority to bind Porter on the claims asserted against International Nautic.

**2.** ***Warranty Claims***

The Court turns its attention now to the warranty claims. While the warranty claims are also based on the October 1 Contract—and as the Court already explained, that contract cannot form the basis for any liability for Porter—SelectSun has a fundamental damages problem with its warranty claims worth highlighting. SelectSun seeks the purchase price, financing costs, and the purchase price of a boat lift in damages for all of its claims. A buyer who accepts goods may recover for breach of warranty on the sale under Indiana law. *See* Ind. Code § 26-1-2-714. There are four measures of damages for breach of warranty under the Indiana Code:

> (1) the cost of repair . . .; (2) the fair market value of the goods as warranted minus the salvage value; (3) the fair market value of the goods as warranted at the time of acceptance less the fair market value of the goods as accepted; and (4) the replacement costs less the value of the plaintiff's use of the good up to the time of trial.

*Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1050 (Ind. Ct. App. 2009) (footnotes omitted). Incidental and consequential damages which are reasonably foreseeable may also be recovered in a breach of warranty case. *Id.* (citing Ind. Code § 26-1-2-715). SelectSun has produced no evidence on any of these measures of damages. Therefore, it has not met its burden of proof on any of the warranty claims.

3.      *Magnuson-Moss Act*

SelectSun also brought a claim under the Magnuson-Moss Act. Consumers have four

causes action under the Act: they may sue for failure "to comply with any obligation [1] under

this title, or [2] under a written warranty, [3] implied warranty, or [4] service contract . . . ." 15

U.S.C. § 2310(d)(1). At trial, SelectSun did not identify a theory of recovery under the

Magnuson-Moss Act, and instead highlighted that the Act provides for an award of attorneys'

fees if it succeeds on its warranty claims. SelectSun's warranty claims are based on the October

1 Contract, which is not a service contract and does not include a written warranty.[21] If

SelectSun's Magnuson-Moss Act claim is premised on its implied warranty claims, such claims

are governed by state law. 15 U.S.C. § 2301(7). As the Court detailed earlier, SelectSun's state

law warranty claims are deficient for two reasons. First, under Indiana law Porter is not liable for

any claims derived from the October 1 Contract under an apparent authority theory. Second,

SelectSun has not met its burden of proof on the required elements for a warranty claim under

Indiana law. Hence, Porter also prevails on SelectSun's Magnuson-Moss Act claim.


4.      *Duty of Good Faith and Fair Dealing Claim*

SelectSun also brought a claim for a breach of the duty of good faith and fair dealing

against Porter. Indiana's version of the Uniform Commercial Code provides for a duty of good

---

[21] Not all written statements are "written warranties" within the meaning of the Magnuson-Moss Act. *See* 15 U.S.C. § 2301(6). To be a "written warranty" under the Act, "there must be either (1) a specific undertaking by the warrantor to remedy defects, or (2) an affirmation of fact or promise that the product is defect free or will meet a specified level of performance over a specific period of time." Milton R. Schroeder, *Private Actions under the Magnuson-Moss Warranty Act*, 66 Cal. L. Rev. 1, 8 (1978). The warranty that is written into the October 1 Contract consists of the following: "Seller declares that the manufacturer grants a 12 month extension warranty on the motors and drives and a 24 month manufacturer's warranty on all other components, and a 120 month manufacturer's warranty on the boat's hull." The statement does not mention any replacement or other remedial action, nor does it state that the boat would meet any specified level of performance. It is therefore not a "written warranty" under the Act. *See Semitekol v. Monaco Coach Corp.*, 562 F. Supp. 2d 1009, 1027–28 (N.D. Ill. 2008).

faith and fair dealing to contracts involving the sale of goods. *See Amaya v. Brater*, 981 N.E.2d 1235, 1239 (Ind. Ct. App. 2013). But, as explained earlier, Porter was not a contracting party with SelectSun or any other entity controlled by Schwaiger. Since Porter was not bound by a contract that provided a duty of good faith and fair dealing, there can be no breach of the same.

**5.      *Unjust Enrichment***

SelectSun's final claim against Porter is based on unjust enrichment. "To recover for unjust enrichment, the plaintiff must show that (1) he rendered a measurable benefit to the defendant at the defendant's express or implied request; (2) he expected payment from the defendant; and (3) allowing the defendant to retain the benefit without restitution would be unjust." *Neibert v. Perdomo*, 54 N.E.3d 1046, 1051 (Ind. Ct. App. 2016) (citing *Reed v. Reid*, 980 N.E.2d 277, 296 (Ind. 2012)). Unjust enrichment is an equitable doctrine governed by principles of equity, and may be maintained (as here) in the absence of a contract. *Id.*

The facts in this case do not fit the unjust enrichment claim. For example, SelectSun seeks to recover (1) the purchase price of the boat, (2) the cost of a boat lift, and (3) financing costs related to buying the Boat. The cost of the boat lift and the financing costs related to buying the Boat were never "benefits" conferred on Porter. Rather, the financing costs were provided to a financing entity, and Zurhausen presumably received the payment for the boat lift.[22] Further, as demonstrated by the evidence provided by SelectSun, Porter never received the entire purchase price paid by Schwaiger to Zurhausen for the Boat (or the boat lift). Instead, the record shows that International Nautic paid Porter $543,356.00 for the Boat. (Sales Order Confirmation, Pl.

---

[22] While Plaintiff's Exhibit 12 is the contract for the boat lift, there is no documentation that the boat lift has been paid in full.

Ex. 65.) To the extent that Porter received any benefit, however indirectly, it is not the purchase price paid by SelectSun.

Beyond that, SelectSun has not shown that Porter unjustly received, however indirectly, $543,356.00. The record demonstrates that Porter built the Boat according to International Nautic's specifications. Porter is not to blame for the decision to proceed with the custom exhaust system rather than one that was CE-certifiable. Porter employees alerted International Nautic's representatives, including Leila Burger, on several occasions that the custom exhaust system would not be CE-certified. It appears that, despite these conversations, Leila Burger thought that the custom exhaust system would be CE-certifiable, possibly through a custom fix. If this was a mistake, it was Leila Burger's, not Porter's. Given this, the Court declines to invoke its equitable powers and denies SelectSun's claim for unjust enrichment.

**B.      International Nautic Liability**

The Court has already determined that a default judgment is an appropriate sanction against International Nautic under Federal Rules of Civil Procedure 16(f)(1) and 37(b)(2)(A)(vi). (*See* ECF Nos. 130, 170.) Entry of default judgment under Rule 37 requires a showing of "willfulness, bad faith, or fault[.]" *Hindmon v. Nat'l-Ben Franklin Life Ins. Corp.*, 677 F.2d 617, 620 (7th Cir. 1982). That standard is easily met here. International Nautic stopped communicating with its attorneys in early 2015—who then moved to withdraw in February 2015 due to a total breakdown in communication—and failed to produce witnesses for depositions in February 2015. (*See* ECF Nos. 95, 99, 102.) On February 26, 2015, the Court entered an Order [ECF No. 107] setting a telephonic hearing on March 5, 2015, for the motion to withdraw.

Counsel and a representative from International Nautic were ordered to appear. A representative failed to do so. (*See* ECF No. 109.)

Eventually, the Court reached International Nautic's long-time Florida counsel, who (1) confirmed that International Nautic received notice of the Court's hearing, but (2) that International Nautic elected not to appear and was abandoning its defense of the case. (*See* ECF Nos. 109, 110.) International Nautic's local counsel filed a letter, signed by Leila Burger, terminating the local counsel's representation and indicating that International Nautic was abandoning its defense in the case. (*See* ECF No. 115.)

On March 25, 2015, the Court issued a Notice and Order [ECF No. 122] granting International Nautic's local counsel's motion to withdraw, and affording International Nautic up to and including April 9, 2015, to obtain new counsel and cause the new counsel to enter an appearance on its behalf. (*See* ECF No. 122.) The Court warned International Nautic that its failure to do so may result in default judgment. Additionally, the Court ordered International Nautic to show cause for its failure to attend the March 5, 2015, hearing by submitting a written statement to the Court on or before April 16, 2015. (*See id.*) The Court warned International Nautic that failure to show cause may result in sanctions, including the entry of a default judgment. International Nautic never responded.

The entry of default and default judgment are governed by Federal Rule of Civil Procedure 55.[23] Rule 55(b) applies to the entry of default judgments. Rule 55(b)(1) applies in cases where a defendant has defaulted for not appearing, and the party is neither a minor nor an

---

[23] "Default" and "default judgment" are distinct; the former involves liability, the later determines damages. Under Rule 55(a), a default can be entered by the clerk against a party who has failed to plead or otherwise defend. A court, or in certain instances clerk of the court, may then enter a default judgment at a later date. Fed. R. Civ. P. 55(b); *see also In re Uranium Antitrust Litig.*, 473 F. Supp. 382, 388 (N.D. Ill. 1979) ("[W]here a complaint seeks to hold multiple defendants jointly and severally liable for tortious conduct, and fewer than all of them fail to answer or appear, the proper procedure is the entry of a default against them under Rule 55(a), but to withhold entry of a default judgment against them under Rule 55(b) until the case is tried on the merits.").

incompetent person. All other cases are governed by Rule 55(b)(2). In this case, International Nautic appeared in the action, and therefore Rule 55(b)(2) applies.

"The fact that a default is entered does not automatically result in plaintiff recovering what was demended [sic] in the complaint." 10A Fed. Prac. & Proc. Civ. § 2688.1 (4th Ed. 2018). "When a defendant is in default, the well pleaded factual allegations in the [c]omplaint, except those relating to damages, are taken as true." *Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837, 848 (E.D. Mich. 2006) (citations omitted). Additionally, Rule 55(b)(2) empowers the Court to hold hearings when it needs to "(A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." In this case, the Court has received and examined evidence over the course of the bench trial related to the damages, and will use those findings to inform the default judgment against International Nautic.

Throughout the litigation and bench trial, SelectSun consistently highlighted the greatest flaw with the Boat: As delivered, it was not CE-certified. Porter does not dispute this, and all the evidence presented supports this conclusion as well. However, the Boat is usable. Schwaiger testified that he drove the Boat for an entire boating season. The primary problem he had with the Boat during the boating season involved an issue with the drive shaft, which the manufacturer (Ilmor) repaired. SelectSun did not provide sufficient evidence to tie the drive shaft issues to Porter or International Nautic, and instead focused its arguments around CE-certification.

But the evidence presented at the bench trial, specifically the testimony of Wayne Porter and Augusto Villalon, demonstrates that the Boat can be CE-certified with a different exhaust system. The IMCI approved the Formula 420 FX 8 and its variants with an integral exhaust

system for CE-certification in December 2013. Therefore, it appears that the Boat could have been CE-certified before this litigation began in January 2014, with a change to an integral exhaust system. While neither Wayne Porter nor Augusto Villalon testified to a precise amount that such a change would cost, both estimated that the cost of installing an exhaust system that complies with EU standards to be around a few thousand dollars. Potentially as few as $2,000. With the change in exhaust system, the Boat would be in compliance with EU standards, and could be both used and sold in Europe.

Therefore, the Court will direct the Clerk to enter default against International Nautic. It will withhold the entry of a final default judgment until SelectSun provides evidence estimating the cost to replace the exhaust system to bring the Boat into compliance with EU standards. The Court will direct SelectSun to provide evidence of the same by October 31, 2018. If SelectSun does not provide evidence of its damages or file for an extension prior to the deadline, the Court will presume that SelectSun is waiving its pursuit of damages and will proceed accordingly.

**CONCLUSION**

For the foregoing reasons, the Court:

- Finding no just reason for delay, DIRECTS the Clerk of the Court to ENTER JUDGMENT in favor of Defendant Porter, Inc.;

- FURTHER DIRECTS the Clerk of the Court to ENTER DEFAULT against Defendant International Nautic LLC;

- WITHHOLDS ENTRY OF DEFAULT JUDGMENT against Defendant International Nautic LLC; and

- DIRECTS Plaintiff SelectSun to file evidence of its damages in accordance with this Opinion and Order by October 31, 2018.

SO ORDERED on August 31, 2018.

<u>s/ Theresa L. Springmann</u>
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT